## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| HALL ENTERPRISES METALS, INC., individually, and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br>  v.<br><br>GOLDMAN SACHS GROUP, INC., GS POWER HOLDINGS, LLC, METRO INTERNATIONAL TRADE SERVICES, LLC, GLENCORE XSTRATA PLC, PACORINI METALS USA LLC, JP MORGAN CHASE & COMPANY, HENRY BATH LLC, LONDON METAL EXCHANGE LIMITED, LME HOLDINGS LIMITED, and JOHN DOES 1-10,<br><br>       Defendants. | Case No. _____<br><br>**JURY TRIAL DEMANDED**<br><br>**CLASS ACTION COMPLAINT** |

Plaintiff Hall Enterprises Metals, Inc., d/b/a Hall Enterprise Metals ("Plaintiff"), individually and on behalf of the Class of purchasers described below, brings this action against defendants Goldman Sachs Group, Inc. ("Goldman Sachs"), GS Power Holdings, LLC ("GS Power"), Metro International Trade Services, LLC ("Metro"), Glencore Xstrata plc ("Glencore"), Pacorini Metals USA LLC ("PM USA"), JP Morgan Chase & Co. ("JP Morgan"), Henry Bath LLC ("Henry Bath"), London Metal Exchange Limited ("LME"), LME Holdings Limited ("LME Holdings"), and John Does 1 - 10 (collectively, "Defendants") for damages and injunctive relief under the antitrust laws of the United States, and upon information and belief, hereby alleges as follows:

### SUMMARY OF THE CASE

1.  Since at least as early as February 19, 2010 and continuing into the present (the "Class Period"), Defendants have been engaged in a contract, combination, or conspiracy to

unreasonably restrain trade in the market for aluminum and aluminum storage services in the United States.

2.      In order to achieve this goal, Defendants have created, agreed to, and implemented a series of practices and procedures designed to restrict the available supply of aluminum in the market, create artificial delays in obtaining aluminum from LME-approved warehouses, and, ultimately, inflate or maintain aluminum prices.

3.      These practices and procedures include, among other things, delivering only the minimum amount of aluminum required under the LME's warehousing rules, prioritizing finance customers (who don't want to take delivery of the aluminum) over manufacturing customers, shuffling aluminum between warehouses in the same geographic area, and taking inventory "dark" by transferring it from LME-approved warehouses to non-LME warehouses outside of the system. Such conduct, absent coordination, would not be consistent with competitive market forces (*i.e.*, declining to take advantage of gross inefficiencies by competitors in the market).

4.      As a result of this conduct—despite a massive economic decline, a reduction in demand, and a resulting surplus in supply—the overall acquisition price of aluminum has actually increased.  Not only has the spot price of aluminum dropped less than it would have absent Defendants' unlawful conduct, but the banking/warehouse Defendants have also benefited from higher trading commissions and the increased storage fees.  Defendant LME, which received a cut of the warehouses' storage fees, similarly benefited (while simultaneously benefiting from a higher valuation during its recent acquisition).

5.      Those persons like Plaintiff who purchased aluminum, however, were injured by paying higher spot market prices and higher regional premiums (a figure largely comprised of storage costs) for their aluminum.

6.     Not surprisingly, such behavior eventually attracted the attention of government authorities who are currently investigating Defendants for the same anticompetitive practices alleged herein.  Soon thereafter, Goldman Sachs announced that it would change its warehousing practices to make aluminum immediately available and JP Morgan announced it would be leaving the commodities business altogether.  And just recently, after a purported "three-month consultation with the global metals industry," the LME implemented new rules allegedly designed to reduce queue times.

## JURISDICTION AND VENUE

7.     Plaintiff brings this action to obtain injunctive relief and to recover damages, including treble damages, and costs of suit and reasonable attorneys' fees, resulting from Defendants' violations of the Sherman Act, 15 U.S.C. §§ 1 and 2.

8.     The Court has jurisdiction over the subject matter of this action pursuant to Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. § 15 and 26, and 28 U.S.C. § 1331 and 1337. Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c) and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants resides or has agents who reside in this District.

9.     The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) and the Class Action Fairness Act of 2005, 28 U.S.C. § 1711, *et seq.*, because it is a multi-state class action where the aggregate amount in controversy exceeds five million dollars and the citizenship of various members of the class are different from that of one or more of the Defendants.

10.     This Court has personal jurisdiction over each of the Defendants because each of the Defendants, either directly or through the ownership or control of its United States subsidiaries: (a) transacted business in the United States, including in this District; (b) sold substantial quantities of aluminum throughout the United States, including in this District; or (c) was engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, and reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.

11.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, as well as 28 U.S.C. § 1391, because: (a) each of the Defendants resided, had agents in, or transacted business in this District; (b) a substantial part of the events or omissions giving rise the claims described herein occurred in this District; and (c) a substantial portion of the interstate trade and commerce affected by Defendants' conduct took place in this District.

## PARTIES

**A.     <u>Plaintiff</u>**

12.     Plaintiff Hall Enterprises Metals, Inc., doing business as Hall Enterprise Metals, is a Michigan corporation with its principal place of business located in Hastings, Michigan. Plaintiff Hall Enterprise Metals purchased aluminum during the Class Period at a price based on, or otherwise incorporating, the Midwest Premium or another regional premium. Plaintiff Hall Enterprise Metals was damaged in its business or property by purchasing aluminum at prices that were intentionally and directly inflated by Defendants' conduct throughout the Class Period. Plaintiff Hall Enterprise Metals has directly suffered antitrust injury by transacting in the relevant market in which Defendants were intentionally inflating prices.

B.      **Defendants**

*Goldman Defendants*

13.     Defendant Goldman Sachs is a Delaware corporation with its principal place of business located at 200 West Street, New York, New York 10282.  According to its latest 10-K, "Goldman Sachs is a leading global investment banking, securities and investment management firm that provides a wide range of financial services to a substantial and diversified client base that includes corporations, financial institutions, governments and high-net-worth individuals." It is also classified as a "bank holding company" under the Bank Holding Company Act of 1956 (the "BHCA") and a "financial holding company" pursuant to amendments enacted by the U.S. Gramm-Leah-Bliley Act of 1999 (the "GLB Act").

14.     Defendant GS Power is a limited liability corporation organized under the laws of Delaware, and a wholly-owned subsidiary of Goldman Sachs.  Its principal offices are located at 85 Broad Street, New York, New York 10004.  In February 2010, GS Power purchased Metro for $550 million.

15.     Defendant Metro is a limited liability corporation organized under the laws of Delaware, with its principal offices located at 6850 Middlebelt Road, Romulus, Michigan 48174. Metro operates a global network of warehouses that specialize in the storage of non-ferrous metals, many of which are LME-approved.  Its LME-approved warehouses are located in: Detroit, Michigan; Chicago, Illinois; Long Beach, California; Mobile, Alabama; New Orleans, Louisiana; St. Louis, Missouri; and Toledo, Ohio.

*Glencore Defendants*

16.     Defendant Glencore is an Anglo-Swiss public limited company with its principal offices located in Baar, Switzerland and its registered office in Saint Helier, Jersey.  Glencore,

which bills itself as "one of the world's largest global diversified natural resource companies," acquired the metals warehousing business of the Pacorini Group of Italy in August 2010."

17.     Defendant PM USA is a limited liability corporation organized under the laws of Louisiana, with its principal offices located at 2200 Broening Highway, Suite 200, Baltimore, Maryland 21224.  PM USA is a subsidiary of Pacorini Metals AG, which was acquired by Glencore from the Pacorini Group of Italy in August 2010.  It owns and operates LME-approved warehouses in: Detroit, Michigan; Baltimore, Maryland; Chicago, Illinois; Los Angeles, California; Mobile, Alabama; and New Orleans, Louisiana.

*JPMorgan Defendants*

18.     Defendant JP Morgan is a Delaware corporation with its principal place of business located at 270 Park Avenue, New York, New York 10017.  According to its latest 10-K, JP Morgan "is a leading global financing services firm and one of the largest banking institutions in the United States of America, with operations worldwide."  It is also classified as a "bank holding company" under the BHCA and as a "financial holding company" pursuant to amendments enacted by the GLB Act.

19.     Defendant Henry Bath is a limited liability corporation organized under the laws of Maryland, with its principal offices located at 160 Greentree Drive, Suite 101, Dover, Delaware 19904.  Henry Bath, which is a subsidiary of Henry Bath & Son Ltd., was acquired by JP Morgan as part of a deal with RBS Sempra Commodities; that deal was announced on or about February 16, 2010, and completed on or about July 1, 2010.  Henry Bath owns and operates LME-approved warehouses in: Baltimore, Maryland; Chicago, Illinois; and New Orleans, Louisiana.

*LME Defendants*

20.     Defendant LME is the world's largest marketplace for industrial metals trading. Its principal offices are located at 56 Leadenhall Street, London EC3A2DX, United Kingdom. LME was previously owned by LME Holdings until December 6, 2012, when it was acquired by Hong Kong Exchanges & Clearing Ltd. ("HKEC").

21.     Defendant LME Holdings was, prior to December 6, 2012, the holding company that owned the LME.  Prior to the acquisition by HKEC, two of the LME Holdings' largest shareholders were defendants Goldman Sachs and JP Morgan.

*Doe Defendants*

22.     Various entities and individuals participated as co-conspirators in the unlawful acts alleged herein but are currently unknown to Plaintiff.  These persons or entities, identified herein as Does 1 – 10, performed acts or made statements that aided and abetted and were in furtherance of the unlawful conduct described in this Complaint.

## THE ALUMINUM INDUSTRY

### A.      **Aluminum: Characteristics and Manufacturing Process**

23.     Aluminum is the most abundant metallic element on Earth, and is used in many industrial applications as it is lightweight, corrosion-resistant, non-toxic, highly conductive, and malleable.  It is also easily alloyed with other elements, such as magnesium, silicon, copper, or zinc, which can improve its strength and other desired traits.  It is the second most widely-used metal in the world behind steel.

24.     The three major markets for aluminum are transportation, packaging, and construction.  The transportation market accounts for approximately one-third (1/3) of all aluminum shipments, where it is used to make cars, light trucks, tractor trailers, trains, airplanes,

and boats.  The packaging market accounts for approximately twenty percent (20%) of all aluminum shipments, where it is used to make beverage/food cans and household foils.  The construction market accounts for approximately fifteen percent (15%) of all aluminum shipments, where it is used to make window/door frames, rooming, siding, structural framing, gutters/downspouts, and garage doors.

25.     The chief source of aluminum is bauxite, a rock containing a mixture of hydrous aluminum oxides, which is primarily found in Australia, Brazil, Guinea, China, Suriname, Jamaica, and India.  Bauxite is refined into alumina via the Bayer Process, whereby bauxite is dissolved in a solution to convert the alumina into aluminum hydroxide which, after cooling, precipitates and is then removed and reheated leaving pure alumina.  Alumina is then converted into aluminum using an electrolytic reduction method called the Hall-Heroult process, whereby alumina is combined with cryolite and an electric current is passed through the mixture.

26. The resulting aluminum is typically smelted into shapes that are easily stored yet suitable for future processing, such as ingots, billets, cast rods, powder, or rolling slabs.  For example, one commonly used form for commodities trading is called the "commodity-grade aluminum P1020 ingot," which is a brick-shaped ingot composed of 99.7% pure high-grade aluminum.  Later, a mill can roll, cast, extrude, or forge this aluminum into coils, plates, sheets, or other semi-fabricated forms, that can then be sold to purchasers such as Plaintiff.  This is commonly referred to as "primary aluminum" to distinguish it from aluminum that has already been placed into consumer circulation and recycled.

**B.     The London Metals Exchange**

27.     The LME was founded in 1877 and serves at the world's largest marketplace for industrial metals trading.  According to the LME: "More than 80% of the global non-ferrous on-

exchange business is conducted on its markets, equating to $14.5 trillion, 3.7 billion tonnes and 160 million lots in 2012."  Moreover, "[t]rading on the LME often exceeds world metal production by a factor of 40."

28.    The LME has a multi-tiered membership structure that includes seven (7) categories of membership:

- Category 1 members are called "Ring Dealing Members" and are entitled to trade in the Ring (the LME's open-outcry trading floor), on LMEselect (the LME's electronic trading platform for all LME contracts), and by telephone.  They are also members of the LME's clearing house.

- Category 2 members are called "Associate Broker Clearing Members" and have all the privileges of Ring Dealing Members *except* the ability to trade in the Ring.

- Category 3 members are called "Trade Clearing Members" and are permitted to trade and clear their own business but they cannot issue client contracts or trade in the Ring.

- Category 4 members are called "Associate Broker Members" and can issue LME contracts but are not members of the LME's clearing house.

- Category 5 members are called "Associate Trade Member" and have no trading rights except as clients.

- Categories 6 and 7 are reserved for individual and honorary members.

JP Morgan is a Category 1 member of the LME, and Goldman Sachs is a Category 2 member.

29.    Aluminum has been traded on the LME since at least 1978.  During the Class Period, virtually all aluminum futures contracts in the United States— between 95% and 99%— were traded on the LME.  But as described by one of the largest consumers of aluminum in the United States, "the LME's influence extends beyond the futures markets.  [...][A]luminum prices charged by producers and paid by purchasers are almost all set with a reference to an LME price and an applicable regional premium.  Thus any actions the LME takes that affect the LME price or regional premia are likely to have an immediate and tangible impact on the physical market."

30.     The LME also maintains a network of approved warehouses to support physical delivery of aluminum.  The LME does not own or operate these warehouses; rather, it certifies the warehouses so that their owners can store LME-registered aluminum pursuant to warrants, which record title for the aluminum.

31.     The warrant records the weight, origin, brand, and location of the aluminum, and gives its holder the right to take physical delivery.  Warrants are tracked through a centrally-maintained electronic records system, LMEsword, which utilizes a standard format and includes a unique barcode.  According to the LME website: "The efficient transfer of warrants using LMEsword is an important part of driving price correlation with the physical market."

32.     Aluminum in an LME warehouse for which a warrant has been issued is referred to as "on warrant."  A cancellation occurs when someone redeems the warrant for the underlying aluminum, now referred to as "off warrant," but the aluminum remains in the warehouse until physical delivery/receipt can and is made.

33.     The purpose of these warehouses is to act as a supplier of last resort for the physical market and to provide a means for arbitrage between LME prices and physical prices. As explained by the LME on its website, "the possibility of physical settlement plays a vital role in creating price convergence and ensuring our prices closely align with that of the physical spot market."

34.     In the United States, three entities—Metro (owned by Goldman Sachs), Henry Bath (owned by JP Morgan Chase & Company) and PM USA (owned by Glencore Xstrata plc)—account for approximately 75% of all LME-approved warehouses.  These warehouses are located in: Detroit, Michigan; Baltimore, Maryland; Chicago, Illinois; Long Beach, California;

Los Angeles, California; Mobile, Alabama; New Orleans, Louisiana; Owensboro, Kentucky; St. Louis, Missouri; and Toledo, Ohio.

35.     Each LME-certified warehouse must abide by the rules and regulations set by the LME's Warehousing Committee, including the *LME Policy Regarding the Approval of Warehouses* (the "LME Warehouse Rules").  The current LME Warehousing Committee includes members from each of the defendant groups: Peter Marc Waszkis (Pacorini), Chris Wibbelman (Metro), and Graham Hawkins (Henry Bath).

36.     Among other things, the LME Warehouse Rules require each warehouse to abide by a minimum daily delivery tonnage which is contingent upon the warehouse's authorized space or, for companies housing more than 300,000 tonnes of metal, the amount of tonnage in storage.

37.     As of April 1, 2013, the minimum daily delivery requirements are as follows:

| Warehouses Storing > 300,000 Tonnes of Metal | |
| --- | --- |
| Authorized Space Per Location (Sq. M.) | Minimum Daily Delivery (Tonnes) |
| 2,500 | 800 |
| 5,000 | 1,200 |
| 7,500 | 1,500 |

| Warehouses Storing > 300,000 Tonnes of Metal | |
| --- | --- |
| Metal Stored Per Location (Tonnes) | Minimum Daily Delivery (Tonnes) |
| 300,000 – 599,999 | 2,000 |
| 600,000 – 899,999 | 2,500 |
| 900,000 and over | 3,000 |

38.     Notably, these minimum daily delivery requirements do not apply per warehouse but per "location" (*i.e.*, city); they also do not account for deliveries *in*, only deliveries *out*.  More

importantly, the rules do not require that delivery take place outside of a particular city and, therefore, a warehouse company could meet the minimum daily delivery requirements simply by moving metal to another warehouse across town.

    39.    The LME also publishes maximum rental charge and free on truck ("FOT") rates. As of April 2013, the maximum rents for storing primary aluminum in an LME-certified warehouse are as follows:

| Location | Warehouse Company | Maximum Rate ($ per tonne per day) |
|---|---|---|
| Baltimore | C. Steinweg (Baltimore) Inc. | 0.47 |
| | CWT Commodities (USA) LLC | 0.47 |
| | Edgemere Metals USA LLC | 0.47 |
| | Henry Bath LLC | 0.47 |
| | NEWS (USA) Inc. | 0.47 |
| | Pacorini Metals USA LLC | 0.48 |
| | SH Bell Company | 0.46 |
| Chicago | CWT Commodities (USA) LLC | 0.47 |
| | Henry Bath LLC | 0.47 |
| | Metro International Trade Services LLC | 0.48 |
| | NEMS (USA) Inc. | 0.47 |
| | Pacorini Metals USA LLC | 0.47 |
| | SH Bell Company | 0.46 |
| Detroit | Metro International Trade Services LLC | 0.48 |
| | Pacorini Metals USA LLC | 0.47 |
| | Worldwide Warehouse Solutions LLC | 0.48 |
| Long Beach | Metro International Trade Services LLC | 0.48 |
| Los Angeles | Pacorini Metals USA LLC | 0.47 |
| Mobile | Metro International Trade Services LLC | 0.48 |
| | Pacorini Metals USA LLC | 0.47 |
| New Orleans | Henry Bath LLC | 0.47 |
| | Metro International Trade Services LLC | 0.48 |
| | NEMS (USA) Inc. | 0.47 |
| | Pacorini Metals USA LLC | 0.48 |
| | Worldwide Warehouse Solutions LLC | 0.47 |
| Owensboro | Owensboro Riverport Authority | n/a |
| St. Louis | Metro International Trade Services LLC | 0.48 |
| | Worldwide Warehouse Solutions LLC | 0.47 |

| Toledo | C. Steinweg (Baltimore) Inc. | 0.47 |
| | Metro International Trade Services LLC | 0.48 |

40.     Accordingly, the LME not only dictates which warehouses get certified, it also controls what the rent and output of those warehouses will be.

**C.     Aluminum Pricing**

41.     The vast majority of all aluminum is sold at a price which has two components: (1) a price set on the LME exchange (usually the daily spot price); and (2) a regional premium (which, for domestic purchasers, is usually the Midwest Premium).  The regional premium reflects the costs of transportation, insurance, and handling, as well as regional supply and demand conditions.

42.     Thus, as described by one of the largest consumers of aluminum in the United States, "[A]luminum prices charged by producers and paid by purchasers are almost all set with a reference to an LME price and an applicable regional premium.  Thus, any actions the LME takes that affect the LME price or regional premia are likely to have an immediate and tangible impact on the physical market."

43.     As noted by another source, "Worldwide, LME prices provide the reference point for trading much of the metal that is directly exchanged (notably including material that does not pass through LME warehouses).  Trade publications quote metals at a premium to the LME."  A. Dunsby, J. Eckstein, J. Gaspar, and S. Mulholland, COMMODITY INVESTING: MAXIMIZING RETURNS THROUGH FUNDAMENTAL ANALYSIS, at p. 270 (John Wiley & Sons, Inc. 2008).

## DEFENDANTS' ANTICOMPETITIVE CONDUCT

A.   **The Banking Industry Persuades Congress and the Federal Reserve to Allow Them to Enter the Physical Commodities Business**

44.     Historically, the separation of banking and commerce has been one of the fundamental principles underlying the U.S.-system of bank regulation.  The purpose of this separation has been to safeguard the safety and soundness of the depository system, ensure that credit is efficiently and impartially allocated, and prevent a disproportionate concentration of economic power.  Accordingly, several federal statutes—dating as far back as the National Bank Act of 1863 up to and including the Dodd-Frank Act of 2010—generally bar banks from conducting commercial, non-financial activities.

45.     In particular, the Glass-Steagall Act of 1933 (the "Glass-Steagall Act") prohibited banks from engaging in securities trading, dealing, and underwriting, and the Bank Holding Company Act of 1956 (the "BHCA") generally prohibited a bank holding company from engaging in most non-banking activities or acquiring voting securities of certain companies that were not banks.

46.     In 1999, after intense lobbying pressure by the banking industry, Congress partially repealed the Glass-Steagall Act and the BHCA by enacting the Gramm-Leach-Bliley Act of 1999 ("GLBA").  Under the GLBA, commercial banks and securities firms were permitted to acquire or affiliate with any company that the Federal Reserve Board of Governors had determined "(A) to be financial in nature or incidental to such financial activity; or (B) is complementary to a financial activity and does not pose a substantial risk to the safety or soundness of depository institutions or the financial system generally."  12 U.S.C. Section 1843(k)(1).

47.     Regulation Y, 12 CFR 225 ("Regulation Y"), lists those non-banking activities that are "so closely related to banking or managing or controlling banks as to be a proper incident thereto" (*i.e.*, those which are permissible under the GLBA).  In 2003, the Federal Reserve Board of Governors amended Regulation Y to "permit bank holding companies to (i) take and make delivery of title to commodities underlying commodity derivative contracts on an instantaneous, pass-through basis; and (ii) enter into certain commodity derivative contracts that do not require cash settlement or specifically provide for assignment, termination, or offset prior to delivery."  68 Fed. Reg. 39,807 (July 3, 2003).

**B.     Goldman, JP Morgan, and Glencore Enter the Metal Warehousing Business**

48.     Following the U.S. financial crisis in 2008 and 2009, demand for aluminum fell and future prices became significantly higher than the then-current spot price.  Such conditions create what is called a "contango," where the price of a commodity for future delivery is higher than the spot price.  In other words, a contango is an upward sloping forward curve.

49.     On or about February 19, 2010, in the wake of the financial crisis, Goldman Sachs announced that it was purchasing Metro.  By acquiring Metro, Goldman gained control of one of the largest metals warehouse companies in the LME network and positioned itself directly in the middle of the global metals trading chain.  Ownership of these key LME warehouses transformed Goldman—which is itself a commodity trader through its wholly-owned subsidiary J. Aron & Company ("J. Aron")—into an integrated financial and physical metals player. Consequently, Goldman was able to exert control over the supply of aluminum to end-users and, in turn, control prices.

50.     This control over aluminum prices was exacerbated by Goldman's ability to make aluminum inventories visible or invisible to the public, thus creating the appearance of scarcity

or abundance of supply.  As described by one source at the Financial Times, "commodity collateral can be reclassified from private 'dark inventory' to publicly visible inventory, according to the interests of the trading institutions."

51.     Not surprisingly, at approximately the same time, JP Morgan entered the metals warehousing business by acquiring Henry Bath (as part of JP Morgan's purchase of RBS Sempra Commodities).  That deal was initially announced on or about February 16, 2010, and completed on or about July 1, 2010.  On the day that deal closed, Blythe Masters, the Head of Global Commodities at JP Morgan Chase, stated: "Just being able to trade financial commodities is a serious limitation because financial commodities represent only a tiny fraction of the reality of the real commodity exposure picture.  We need to be active in the underlying physical commodity markets in order to understand and make prices."

52.     Soon thereafter, Glencore also entered the metals warehousing business when it acquired Pacorini in a deal announced on or about August 2, 2010, and completed on or about September 14, 2010.

53.     As a result, Defendants now own and control 133 of the 159 LME-certified metals storage warehouses in the United States.  Goldman Sachs in particular, through its ownership of Metro, has warehoused approximately 70% to 80% of the nation's LME aluminum supply during the Class Period.

## C.     Defendants Create a "Super Contango," Increase Their Inventories, and Generate Artificially Long Queues for Aluminum

54.     Some level of contango (also called forwardation) is a cyclical, naturally-occurring phenomenon, especially for non-perishable commodities such as aluminum which have a cost of carry.  Soon after Defendants entered the physical aluminum storage business, however, the spread between current and future aluminum prices became such that—even after

accounting for storage, insurance, and other carrying costs—it was extremely profitable to purchase the commodity, store it, and then sell it forward or hold onto it until prices rise.  Such conditions cannot be explained by the typical interest and storage costs that normally accompany contango, and are sometime referred to as a "super contango."

55.     As a result, throughout the Class Period, approximately 70% to 80% of aluminum has been locked into financing deals, such as futures contracts, as opposed to entering the market.  As yet another illustration, in 2010, the amount of aluminum purchased for financing deals was twenty-nine (29) times that purchased for physical delivery; by 2012, that amount had increased to thirty-seven (37) times that for physical delivery.

56.     Moreover, over the course of the Class Period, Defendants enticed aluminum producers to store even more aluminum at their warehouses by offering higher and higher incentives.  For example, Metro reportedly has offered as much as $250 per tonne to store aluminum in its warehouses.

57.     Defendants' efforts have been successful.  During the Class Period, the amount of aluminum stored in LME-certified warehouses has risen dramatically from less than 800,000 tonnes in early 2010 to more than 1,400,000 tonnes in summer 2013.

58.     At the same time, Defendants not only were loading more and more aluminum *into* their warehouses, but they were also delivering less and less aluminum *out*.  In fact, Metro's Detroit locations took in 364,175 tonnes of aluminum but delivered out only 171,350 tonnes. These figures represented 42% of global inventory arrivals but only 26% of the metals delivered out.

59.     As a result, getting aluminum out of Defendants' warehouses has also become more difficult as queue times have increased dramatically.  For example, just prior to Goldman

Sach's acquisition of Metro, it reportedly took less than six weeks to obtain aluminum from LME-certified warehouses in North America after requesting delivery.  By June 2011, the same requests took an estimated six to ten months, and by February 2012 it took sixteen months.

60.     The same problems extend to Defendants' warehouses outside the United States.  According to one London-based trader quoted by REUTERS, "[f]resh material is being bid slightly because Pacorini are paying big incentives to get metal there, in Vlissingen [Netherlands].  Then they deliver it to the market and whoever holds it can't actually get it out for a year."

61.     To further highlight the degree of difficulty in obtaining aluminum out of Defendants' warehouses, 916,425 of the 1.46 million tonnes of aluminum at Metro's Detroit warehouses, or 63%, were on canceled-but not-yet-delivered warrants as of August 15, 2013.

62.     According to Jorge Vaszquez, founder and managing director of Harbor Aluminum Intelligence: "Before 2010, lead times in the aluminum market in North America were rarely more than a month.  Suddenly, the lead-time jumped as high as 10 months.  Unprecedented lead times have produced unprecedented complaints."

63.     Despite the increasing queues and customer complaints, Defendants still rarely if ever moved from their warehouses more than the minimum daily amount of aluminum required by the LME Warehousing Rules.  Some Defendants have attributed these problems to logistical problems, such as difficulties in locating specific customer's stores of metal and shortages of trucks and forklift drivers.  Interviews with current and former employees of Defendants' warehouses, however, reveal that such assertions are simply false.

64.     For example, one employee of Metro stated that, right after Goldman Sachs acquired the company, employees received an order to take metal from Metro's LME warehouse on Lynch Road and store it in Metro's non-LME certified warehouse on Mt. Elliott Road.  He

explained, "We were taking it out of the warrant system by placing the aluminum in a non-LME warehouse." The same employee also reported shipping aluminum out of Metro's LME warehouses and into nearby warehouses not owned by Metro, such as those owned by Dearborn Steel and Koch Worldwide. Then the same aluminum shipments would return anywhere from a month to a year later, placing them again on warrant and into the LME system.

65.    The reasons for this "merry-go-round of metal," as one former Metro employee referred to it, were never properly explained by management. Another former employee concurred: "It was a big mystery. Everything was moved around...shuffled around." When employees asked management why they were suddenly shipping aluminum back and forth between warehouses, mangers provided dubious responses such as "we're trying to put the customer's product into one warehouse" or "it has something to do with the LME."

66.    According to another former Metro employee, the company's lackadaisical approach to delivering metal did not develop until after Defendants entered the metal warehousing business. In fact, prior to 2010, employees were under intense pressure to get metal to customers on time. Employees often worked overtime to meet customer deadlines. As stated by one former employee: "We had to stay late if they wanted their metal. If a customer asked for one hundred warrants in two days, we'd have to stay late to make it happen." This sense of urgency came to sudden halt, however, once Defendants entered the picture. Delivery of aluminum was now handled by "skeleton crews," overtime required prior approval, and employees were no longer permitted to work Saturdays as they had previously done.

67.    The long queues and delayed delivery times described above are not the result of normal market forces. As noted by Mr. Vaszquez of Harbor Aluminum Intelligence: "Because of the unprecedented and increasing cost of sourcing out metal in Detroit…given the emergence

of a record queue in a context of a critical mass of metal concentrated in one warehousing

company in one location with what clearly seems to be an inorganic  load-out rate."

68.     This explanation was corroborated by former Metro employees who described the

artificial delays as part of company's internal business plan strategy.  In fact, the 1,500 tonne per

day *minimum* requirement set by the LME was described internally at Metro as a daily *maximum*.

According to one former warehouse supervisor, had the company not placed a limit on the

amount of aluminum delivered each day, Metro could have shipped out 10,000 tonnes of

aluminum per day.

69.     The above-described practices were specifically designed so that Defendants

could take inventory dark (*i.e.*, out of the LME system) and out of the dark (*i.e.*, back into the

LME system) according to their own needs.  This, in turn, enabled Defendants to control what

the public perceived as the available supply of aluminum.  Indeed, Coca-Cola, one of the world's

largest aluminum purchasers, filed a complaint with the LME in 2011 alleging that Goldman

Sachs was intentionally limiting the release of aluminum from Metro's warehouses in order to

inflate the price of aluminum.

70.     At the same time, shuffling aluminum between warehouses could create the

perception of increased demand.  When you take aluminum out of an LME warehouse, you

cancel a warrant.  Therefore, an increase in the number of canceled warrants creates the illusion

of an increase in demand.

71.     Therefore, by entering the metals warehousing business and creating a super

contango in the aluminum market, Defendants were able to collect artificially-inflated

warehousing fees *and* manipulate aluminum prices and trades.  At least for Goldman Sachs (and

perhaps other Defendants), this had an additional benefit as its J. Aron unit was one of the largest aluminum owners in Metro's warehouses (behind Mitsubishi).

72.     As discussed more fully below, each of the Defendant groups is being investigated by government agencies with respect to their warehousing practices and the impact of those practices on aluminum pricing.  This is more than parallel conduct.  Absent coordination, such behavior—delivering only the minimum amount of aluminum required under the LME warehousing rules, shuffling aluminum between warehouses in the same geographic area instead of delivering it to customers who need it, and causing unreasonably long queues and delivery times—would be against each individual Defendant's unilateral self-interest as their competitors would take advantage of those gross inefficiencies to steal market share.

**D.     Defendants' Artificially-Created Aluminum Shortage Props Up Prices**

73.     As a direct result of the conduct described above, two price effects occurred during the Class Period: (1) the spot price of aluminum, while generally declining, was artificially higher than it would have been but for Defendants' conduct; and (2) the Midwest Premium more than doubled.  As previously discussed, these two components comprise the acquisition price of aluminum in the market.

74.     The following graph depicts the spot price of aluminum during the Class Period:



75.     As the graph above reveals, the spot price of aluminum increased shortly after Defendants entered the market and again in spring/summer 2011, but overall it generally decreased during the Class Period (albeit less than it would have but-for Defendants' conduct, especially in light of the actual oversupply that is believed to exist).  Defendants' practices— including hiding inventory in non-LME warehouses and taking it dark, shuffling canceled warrants between LME warehouses instead of delivering them to buyers who intend to actually use them—has kept prices from falling as much as they should.

76.     At the same time, however, the second price component—the Midwest Premium—has more than doubled since Defendants entered the metals warehousing market:



77.     Not only do these rising regional premiums represent increased storage fees to the Defendants owning and operating warehouses, they also represent increased fees to LME since it receives 1% (later increased to 1.1%) of the total storage fees charged by LME-approved warehouses.

78.     According to one article in the NEW YORK TIMES questioning Defendants' aluminum warehousing practices, "efforts by Goldman and other financial players have cost American consumers more than $5 billion over the last three years, say former industry executives, analysts and consultants."

**DEFENDANTS COME UNDER SCRUTINY**

79.     Defendants' practices have not gone completely unnoticed.  In February 2011, Anthony Lipmann, former Chairman of the Minor Metals Trade Association, testified before the U.K. House of Commons' Select Committee on Science and Technology and accused the four large metals warehousing companies of "restrictive" and "manipulative" practices.

80.    Also in 2011, as noted above, Coca-Cola (one of the world's largest aluminum purchasers) filed a complaint with the LME alleging that Goldman Sachs was intentionally limiting the release of aluminum from Metro's warehouses in order to inflate the price of aluminum.

81.    In response, the LME commissioned a study by Europe Economics.  Notably, the study was not publicly released and no sweeping changes were made.  Instead, the LME adopted one minor recommendation: it raised the minimum delivery requirement for large warehouses (*i.e.*, those with more than 900,000 tonnes of aluminum in one city) from 1,500 tonnes to 3,000 tonnes per day.

82.    As noted by one Morgan Stanley analyst at the time, "[t]he move is too little too late to have a material effect in the near-term on an already very tight physical market, particularly in the U.S."  Time Weiner, Global Risk Manager of Commodities/Metals for Miller Coors LLC concurred: "The LME dismissed our proposals.  The changes they have made and recently proposed to increase the daily load-out rates are minimal and would seem to make no real impact...."

83.    In November 2012, the European Commission ("EC") indicated that it was discussing aluminum premiums and "difficulties" in receiving metal from LME warehouses with the Internal Market and Services Directorate General.  According to Carlo Corazza, a spokesman for the EC's Enterprise and Industry Directorate General, "We can confirm that industry, especially aluminum industry, has brought to our attention the difficulties with accessing material from LME warehouses and abnormal high premiums."  These comments by the EC prompted one analyst at Societe Generale to opine that these discussions "might be a prelude to a full-scale investigation."

84.     In July 2013, the Federal Reserve Board announced that it was reviewing its prior decision to allow regulated banks to trade in the physical commodity markets on the basis that those trades were "complementary to financial activities" as defined by the GLB Act and Regulation Y.  The Senate Banking Committee followed with a hearing less than a week later, querying whether banks should be permitted to own and control power plants, warehouses, and oil refineries.

85.     Also in July 2013, the U.S. Commodities Futures Trading Commission ("CFTC") sent a letter to banks and warehousing firms ordering them to preserve emails, documents, and instant messages over the past three years.

86.     Approximately a month later, in early August 2013, the CFTC sent subpoenas to Goldman Sachs, JP Morgan, Glencore, Pacorini, and perhaps others as part of an inquiry into metals prices.  The subpoenas reportedly included more than thirty (30) areas of interest to the CFTC including one asking about "anything that relates to moving metal from one warehouse to another within the same company...and procedures for loading out."  It also reportedly asked for details on any trading based on prices on the LME and Platts, a unit of McGraw Hill that publishes price assessments of physical commodity markets including the Midwest Premium.

87.     At approximately the same time, the U.S. Department of Justice ("DOJ") visited at least one unidentified metals warehousing firm in the United States.  The DOJ reportedly had started its own probe into the metals warehousing industry in or around July 2013.

### MARKET DEFINITION AND MONOPOLY POWER

88.     Defining a relevant market is unnecessary where, as here, there will be direct evidence to establish market power—*i.e.*, Defendants' ability to control aluminum storage fees and exclude competition.

89.     To the extent, however, that indirect evidence of market power becomes necessary, the relevant product market is that for primary aluminum storage services and the relevant geographic market is the United States (the "Relevant Market").

90.     Alternatively, the relevant market may be that for storing LME-warranted aluminum in the United States (the "Alternative Relevant Market").

91.     Over 80% of all non-ferrous metals futures are traded on the LME.  In the United States, Defendants owned and operated approximately 75% of the LME-approved warehouses and are believed to control at least 80% of the LME-warranted aluminum.

92.     While there may be low barriers to entry for warehouses generally, the fact that approximately 70% to 80% of aluminum was tied up in financing deals (95% to 99% of which was traded on the LME) means that Defendants effectively decided who could or could not be in the aluminum warehousing business.

**INTERSTATE TRADE AND COMMERCE**

93.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected interstate commerce.  In fact, Defendants each engaged in substantial business activities in the United States involving billions of dollars of commerce in aluminum.

94.     During the Class Period, the unlawful acts of Defendants and their co-conspirators had the purpose and effect of restricting the available supply, inflating the price, and increasing the storage costs (and, thus, the regional premiums associated therewith) of aluminum.

95.     As a result, the unlawful acts of Defendants and their co-conspirators had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## ANTITRUST INJURY

96.     Defendants' unlawful conduct severely restrained trade and competition, inflated prices, and restricted the available supply of aluminum.

97.     Plaintiff and the members of the Class (defined below) were thus deprived of the benefits of a normal and competitive market, and were instead forced to pay artificially inflated prices for aluminum as a result of Defendants' unlawful conduct.

98.     Consequently, these anticompetitive effects—which are of the type the federal antitrust laws were designed to prevent—caused Plaintiff and the members of the Class (defined below) to suffer financial losses and were, therefore, injured in their business or property.

## CLASS ACTION ALLEGATIONS

99.     Plaintiff brings this action on behalf of itself and as a class action under the provisions of Rule 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.  The "Class" is defined as:

> All persons or entities in the United States that purchased primary aluminum at a price based on or otherwise incorporating the Midwest Premium (or any other regional premium), including but not limited to an averaging over a period of days of any such premium, from February 19, 2010 through the present (the "Class Period"). Excluded from the Class are purchases by entities made directly from the LME warehouses, Defendants, their co-conspirators, officers, directors, management, employees, subsidiaries, or affiliates, and all federal governmental entities.

100.    Plaintiff believes that there are thousands of Class members located throughout the entire United States, the exact number, location, and identities of which are known by Defendants, making the Class so numerous and geographically dispersed that joinder of all members is impracticable.

101.    There are questions of law and fact common to the Class, including:

a)      Whether Defendants and their co-conspirators engaged in a combination and conspiracy amongst themselves to restrict output and to fix, raise, maintain, or stabilize aluminum prices and/or aluminum storage prices in the United States;

b)      The identity of the conspiracy's participants;

c)      The duration of the conspiracy alleged in this Complaint and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d)      Whether the alleged conspiracy violated Section 1 of the Sherman Act;

e)      Whether Defendants and their co-conspirators monopolized, attempted to monopolize, or conspired to monopolize in violation of Section 2 of the Sherman Act;

f)      The effect of the Defendants' and their co-conspirators' conduct on the prices of aluminum in the United States during the Class Period;

g)      Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiff and the other Class members; and

h)      The appropriate Class-wide measure of damages.

102.    Plaintiff's claims are typical of the claims of all Class members, and Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff and all Class members are similarly affected by Defendants' wrongful conduct in violation of the antitrust laws in that they paid artificially inflated prices for aluminum during the Class Period which were based on or incorporated the Midwest Premium or some other regional premium.  Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other Class members. Plaintiff's interests are coincident with, and not antagonistic to, those of the other Class members.

103.    Plaintiff is represented by competent counsel who are experienced in the prosecution of antitrust and class action litigation.

104.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

105.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

106.    Adjudicating the claims of the Class members as a class action is superior to any other available methods because it allows for the fair and efficient adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  The Class is readily definable and this class action presents no difficulties in management that would preclude maintenance as a class action.

## COUNT I

### (Sherman Act Section 1 – Price-Fixing)

107.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

108.    Beginning at least as early as February 19, 2010, and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in the market for aluminum and aluminum storage services in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

109.    The agreement, understanding, and conspiracy entered into between Defendants and their co-conspirators comprises an agreement amongst two or more horizontal competitors to restrict available supply and artificially raise, fix, maintain, and/or stabilize prices.  Such conduct constitutes a *per se* violation of the federal antitrust laws and, in any event, constitutes an unreasonable and unlawful restraint of trade.

110.    In order to accomplish these anticompetitive goals, Defendants and their co-conspirators agreed to at least the following:

a)    Restrict the supply of aluminum shipped out of their warehouses;

b)    Increase queue times and delay the delivery of aluminum out of their warehouses;

c)    Charge super-competitive storage rates;

d)    Treat the LME minimum load-out requirements as maximums rather than minimums;

e)    Establish LME Warehousing Rules that permitted them to disguise their scheme, including but not limited to calculating load-out minimums on a per "location" (*i.e.*, city) rather than per warehouse basis and on a gross, rather than a net, basis; and

f)    Artificially inflate or maintain U.S. spot prices and storage costs (thus also inflating the regional premiums associated therewith).

111.    The aforementioned conduct occurred with the flow of, and substantially affected, interstate commerce.

112.    As a direct and proximate result thereof, competition in the domestic aluminum market was restrained, Plaintiff and the members of the Class paid higher prices for the purchase of aluminum than they would have but-for Defendants' conduct, and Plaintiff and the members of the Class have suffered financial harm to their respective businesses and property.  These injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes the conduct of Defendants and their co-conspirators unlawful.

- 30 -

113.     There are no legitimate business justifications for, or procompetitive benefits caused by, Defendants' conduct.  Moreover, many of the actions undertaken by Defendants would be against their individual unilateral self-interests absent a conspiracy.

## COUNT II

### (Sherman Act Section 2 – Monopolization)

114.     Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

115.     Defendants monopolized, attempted to monopolize, and/or conspired to monopolize the market for primary aluminum storage services in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

116.     From at least February 19, 2010 through the present, Defendants have abused their market power in order to unreasonably limit the free alienability of aluminum in the United States, increase the amount of aluminum stored in their warehouses, increase storage fees, and artificially inflate or maintain spot prices and regional premiums.

117.     The exclusionary and abusive monopolistic activities of the Defendants include but are not limited to: (1) willfully acquiring and/or maintaining a monopoly in primary aluminum storage services; (2) hoarding as much aluminum as possible in Defendants' warehouses; (3) creating the false impression of increased demand and/or reduced supply of aluminum; and (4) increasing storage costs and therefore regional premiums.

118.     The aforementioned conduct occurred with the flow of, and substantially affected, interstate commerce.

119.     As a direct and proximate result thereof, competition in the domestic aluminum market was restrained, Plaintiff and the members of the Class paid higher prices for the purchase

of aluminum than they would have but-for Defendants' conduct, and Plaintiff and the members of the Class have suffered financial harm to their respective businesses and property. These injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes the conduct of Defendants and their co-conspirators unlawful.

120.     There are no legitimate business justifications for, or procompetitive benefits caused by, Defendants' conduct. Moreover, many of the actions undertaken by Defendants would be against their individual unilateral self-interests absent a conspiracy to monopolize.

**COUNT III**

**(Unjust Enrichment)**

121.     Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

122.     As a result of the acts of Defendants and their co-conspirators alleged in this Complaint, Defendants have been unjustly enriched at the expense of Plaintiff and the members of the Class.

123.     Plaintiff and the members of the Class seek restoration of the monies of which they were unfairly and improperly deprived.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and the members of the proposed Class, prays that the Court:

A.     Certifies that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiff as the designated Class representative and its counsel as Class Counsel;

B.      Determines that Defendants have violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2;

C.      Enjoins Defendants' conduct and awards Plaintiffs and members of the Class damages sustained by them, in an amount to be trebled in accordance with the antitrust laws and 15 U.S.C. § 15(a);

D.      Decrees that Defendants have been unjustly enriched by their wrongful conduct and award restitution and disgorgement to Plaintiff and the members of the Class;

E.      Awards Plaintiffs and members of the Class their costs of this suit, including reasonable attorneys' fees, as provided by law;

F.      Awards Plaintiffs and members of the Class pre-judgment and post-judgment interest, in accordance with law and equity; and

G.      Orders such other or further relief as may be just and proper.

## JURY TRIAL DEMANDED

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

Dated:  November 22, 2013                    Respectfully submitted,

/s/James Allen
James Allen (P52885)
ALLEN BROTHERS PLLC
400 Monroe Street, Suite 220
Detroit, MI 48226
Telephone: (313) 962-7777
E-mail: jamesallen@allenbrotherspllc.com

GOLD BENNETT CERA & SIDENER LLP
Solomon B. Cera
595 Market Street, Suite 2300
San Francisco, California  94105
Telephone: (415) 977-2230
Email: scera@gbcslaw.com

Kit A. Pierson
Manuel J. Dominguez
David A. Young
Daniel H. Silverman
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, NW, Suite 500 West
Washington, DC 20005
Telephone: 202-408-4600
Facsimile: 202-408-4699
E-mail: kpierson@cohenmilstein.com
E-mail: jdominguez@cohenmilstein.com
E-mail: dyoung@cohenmilstein.com
E-mail: dsilverman@cohenmilstein.com